1

2

3

4                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
5                                   AT SEATTLE

6    BABAK MOSTAFAVINASSAB,

7                          Plaintiff,

8              v.                                    C15-1280 TSZ

9    CAROLYN W. COLVIN, Acting                       ORDER
     Commissioner of the Social Security
10   Administration,

                           Defendant.
11

12         THIS MATTER comes before the Court on appeal from a final decision of the

13   Acting Commissioner of the Social Security Administration ("Commissioner") denying

14   plaintiff Babak Mostafavinassab's applications for disability insurance benefits ("DIB")

15   and supplemental security income ("SSI") under Titles II and XVI, respectively, of the

16   Social Security Act, 42 U.S.C. §§ 401-434 and 1381-1383f.  Having reviewed all papers

17   filed in connection with the appeal, including the decision of Administrative Law Judge

18   ("ALJ") Tom L. Morris and the 1079-page Administrative Record,[1] the Court enters this

19   order.

20   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

21   [1] Plaintiff contends that the Administrative Record is incomplete.  Ordinarily, an administrative record for
     a matter brought before the Court under 42 U.S.C. §§ 405(g) and/or 1383(c) contains materials pertaining
22   only to the individual seeking judicial review.  See 20 C.F.R. §§ 404.1512 & 405.360.  Like the plaintiff
     in Yost v. Colvin, 2016 WL 2989957 (W.D. Wash. May 24, 2016), however, plaintiff in this case asserts

23

ORDER - 1

## Background

Plaintiff was born in 1968, AR 24, completed high school, AR 25, attended the University of Phoenix, _see_ Ex. 15E (AR 426), was in the United States Air Force from 1988 until 1994, Ex. 19E/1 (AR 432), and has worked since then as a hotel desk clerk (1994-1996), a hotel night manager (1996-1998), and a computer technician (1998-2000), as well as in sales for five different companies (2000-2009), including American Greetings Corporation ("American Greetings"), Ex. 4E (AR 357-64).  In 2007, while employed by American Greetings, plaintiff was injured in a motor vehicle accident.  _See_ Ex. 4E/8 (AR 364); Ex. 19E/1 (AR 432).

According to the summary of plaintiff's DIB application, Ex. 4D/1 (AR 323), plaintiff alleges that his disability began on the date of the motor vehicle accident, _i.e._, February 23, 2007.[2]  The summary of plaintiff's SSI application, however, sets forth an alleged disability onset date of January 1, 2010.  Ex. 3D/1 (AR 316).  In concluding that

---

that the Administrative Record should include redacted copies of 49 decisions issued by ALJ Morris between September 27, 2012, and July 15, 2013, concerning other DIB and/or SSI applicants, as well as copies of psychological or psychiatric evaluations performed in twelve of those cases.  _See_ Compl. at ¶ 3.1 (docket no. 1).  For the same reasons set forth in _Yost_, plaintiff's position in this case is without merit.  ALJ Morris's rulings, and psychological or psychiatric evaluations, about claimants other than plaintiff may not be used to make a determination concerning whether plaintiff is "disabled" within the meaning of the Social Security Act, and thus, such rulings and evaluations are not "evidence" and are not properly made part of the "official record."  _See Yost_, 2016 WL 2989957 at *2.  As explained in _Yost_, ALJ Morris's decisions involving other claimants do not themselves establish bias, routine misapplication of law, or repeatedly improper credibility determinations on the part of ALJ Morris, _see id._ at *2-*5, and thus, as in _Yost_, plaintiff's request to add such items to the Administrative Record is DENIED.

[2] The 2007 date also appears in a Disability Report completed by J. Pfannenstein on November 14, 2012, Ex. 11E/1 (AR 408), and in an undated Disability Report completed by M. Hartman, Ex. 13E/1 (AR 417).

1   plaintiff has not been under a "disability," as defined in the Social Security Act,

2   ALJ Morris used the February 2007 disability onset date.  *See* AR 12.

3   ### A.   **Treatment History**

4       The Administrative Record contains no reports from treatment providers during

5   the roughly two-year period following plaintiff's 2007 motor vehicle accident; however,

6   in connection with plaintiff's related application for benefits under California's workers'

7   compensation system, a Qualified Medical Evaluator, Kevin F. Hanley, M.D., examined

8   plaintiff and reviewed his medical records.  Ex. 1D/6-8 (AR 303-05).  In a report dated

9   June 9, 2010,[3] Dr. Hanley indicated that, when plaintiff was initially evaluated after the

10  motor vehicle accident, he had "significant longstanding and advancing degenerative

11  disease within the cervical spine," although he did "not admit to any particular

12  symptomatology."  Ex. 1D/7 (AR 304).

13      Dr. Hanley summarized plaintiff's course of treatment as follows.  Plaintiff treated

14  with Dr. Robert Nishime, a family medicine physician in California, until May 2007, and

15  then did not see Dr. Nishime again until August 2008, at which point he was referred to

16  Dr. Norman Kahan for a psychiatric evaluation.  *Id.*  A recommendation was made that

17  plaintiff receive a cervical injection, but none had been administered as of the date of

18  Dr. Hanley's evaluation in April 2010.  *Id.*  At the time of Dr. Hanley's evaluation,

19  

20  [3] Based on Dr. Hanley's report, plaintiff's application for permanent disability benefits under California's
    workers' compensation system was denied because he was deemed to have no permanent disability as a
21  result of his injury.  Ex. 1D/9 (AR 306).  His request for workers' compensation benefits was later denied
    with respect to "liability for injury to psyche" because the medical evidence did not substantiate that the
22  injury was "industrial related."  Ex. 1D/12 (AR 309).

23  

ORDER - 3

1  plaintiff was intermittently taking OxyContin (a brand name for oxycodone, an opioid

2  pain medication), MS Contin (a brand name for extended-release morphine), and non-

3  narcotic medications for his symptoms, which included pain radiating into his right

4  shoulder, numbness in his left hand, and tingling in the fingertips of his right hand.[4]  _Id._

5  Plaintiff had also received trigger point injections.  _Id._

6      On May 20, 2010, plaintiff received a cervical epidural steroid injection under

7  fluoroscopic guidance; the procedure was performed by Navtej Tung, M.D. in Goodyear,

8  Arizona.  Ex. 6F/4-5 (AR 632-33).  In late June 2010, a board-certified family nurse

9  practitioner, Erich Widemark, Ph.D., who at that time worked in the same practice as

10  Dr. Tung, opined that plaintiff's medical condition limited his abilities to lift more than

11  10 pounds, to sit or stand more than 20 minutes, and to perform tasks requiring him to

12  hold his neck in a static position for a long period of time (for example, continuous

13  computer usage).[5]  Ex. 6F/2 (AR 630).  Around the same time, plaintiff relocated from

14  Arizona to Washington and began receiving treatment through Pacific Medical Center at

15  Canyon Park in Bothell.  _See_ Ex. 6F/42 (AR 670).

16

17

_____

18  [4] On November 4, 2009, Dr. Nishime indicated by letter that plaintiff should not lift, carry, push, or pull

19  more than ten pounds as a result of his cervical radiculopathy symptoms, which were moderately severe and incapacitating.  Ex. 13F/1 (AR 915).  In ruling on plaintiff's DIB and SSI applications, ALJ Morris assigned "significant evidentiary weight" to Dr. Nishime's opinion.  _See_ AR 22.

20  [5] In concluding that plaintiff is not "disabled," ALJ Morris discounted Dr. Widemark's assessment as

21  being inconsistent with plaintiff's "longitudinal treatment history, the objective clinical findings, his performance on physical examinations, and his independent daily activities."  AR 22-23.  On appeal,

22  plaintiff has criticized ALJ Morris for giving "little weight" to Dr. Widemark's opinion, but he has offered no supporting analysis.  _See_ Pla.'s Brief at 14-16 (docket no. 14-1).

23

ORDER - 4

1  In August 2010, and again in March 2011, plaintiff's primary care physician,

2  Brett Daniel, M.D., completed Washington Department of Social and Health Services

3  ("DSHS") forms concerning plaintiff's condition. *See* Ex. 6F/8-10 & 13-15 (AR 636-38

4  & AR 641-43). Dr. Daniel indicated in the initial DSHS form that plaintiff suffered from

5  cervical radiculopathy, chronic pain, and depression,[6] AR 636, and in the subsequent

6  DSHS form that plaintiff had cervical degenerative disk disease, poorly controlled

7  diabetes,[7] and depression, AR 641. In both forms, Dr. Daniel opined that plaintiff was

8  limited to sedentary work, meaning that he could lift no more than 10 pounds and could

9  sit, walk, or stand for only brief periods. AR 637 & 642. In the latter DSHS form,

10  Dr. Daniel elaborated that plaintiff was limited to sitting or standing for less than 30

11  minutes at a time, needed frequent breaks from computer usage, and had mood and

12

---

13  [6] At the time Dr. Daniel initially examined him in August 2010, plaintiff was already taking citalopram

14  (a selective serotonin reuptake inhibitor used to treat depression) and Xanax (a sedative used to treat anxiety). Ex. 7F/122 (AR 807). Dr. Daniel authorized a refill of the citalopram and speculated that plaintiff's depression and anxiety were related to his chronic neck pain. Ex. 7F/123 (AR 808). On

15  February 4, 2011, Dr. Daniel switched plaintiff from citalopram to Effexor XR, and prescribed diazepam (a sedative first marketed as Valium) to help plaintiff through the transition. Ex. 7F/99 (AR 784).

16  Dr. Daniel also referred plaintiff to psychiatry "to help manage medications [and] rule out other underlying pathology." *Id.* The records from Pacific Medical Center do not reflect whether plaintiff was

17  seen by a psychiatrist as a result of Dr. Daniel's referral. In March 2011, right before completing the second DSHS form, Dr. Daniel doubled plaintiff's dosage of Effexor XR and opined that he "should have significant benefit." Ex. 7F/97 (AR 782).

18  [7] Upon referral by Dr. Daniel, plaintiff was treated by Rebecca Over, D.O., an endocrinologist then at

19  Pacific Medical Center. *See* Ex. 7F/107-08 (AR 792-93); Ex. 7F/77-78 (AR 762-63); Ex. 7F/1-4 (AR 686-89); Ex. 10F/5-7 (AR 863-65); Ex. 17F/6-11 (AR 926-31); Ex. 24F/65-69 (AR 1070-74);

20  Ex. 24F/14-17 (AR 1019-22). Dr. Over authored a letter dated September 23, 2013, stating that she had been treating plaintiff for type 2 diabetes with peripheral neuropathy since 2011 and that "[t]he neuropathy has been difficult to treat despite [plaintiff's] being adherent to his medications." Ex. 23F/1

21  (AR 1005). To the extent that Dr. Over's letter suggested more limitations than those set forth in ALJ Morris's assessment of plaintiff's residual functional capacity, ALJ Morris discounted Dr. Over's

22  letter. AR 23. In his briefing on appeal, plaintiff has not specifically addressed whether ALJ Morris properly accorded "little weight" to Dr. Over's September 2013 letter.

23

ORDER - 5

concentration fluctuations that would restrict to 10 or less hours per week, for the next 12 months, his ability to work, look for work, or train to work.  AR 641-42.

On April 8, 2011, plaintiff made his first complaint to Dr. Daniel of right bicep weakness.[8]  Ex. 6F/46 (AR 674).  By May 2, 2011, plaintiff exhibited complete weakness in his right bicep and was "unable to lift even a pound."  Ex. 6F/16 (AR 644).  Dr. Daniel expressed concern that plaintiff's neck was neurologically compromised and referred him for electromyography ("EMG").  Id.  An EMG performed in May 2011 showed mild right carpal tunnel syndrome and right C5-C6 radiculopathy.  Ex. 7F/157 (AR 842).  Magnetic resonance imaging ("MRI") conducted in July 2011 revealed spinal cord compression, the likely cause of plaintiff's neurological deficits, and led plaintiff's

---

[8] During the preceding five months, another of Dr. Daniel's colleagues at Pacific Medical Center, Ben Lacey, M.D., who specializes in physiatry, physical medication, and rehabilitation, had been treating plaintiff.  On November 3, 2010, Dr. Lacey elected to proceed with narcotic management of plaintiff's pain "to allow him to be more functional especially with his very challenging course work."  Ex. 7F/118 (AR 803).  Dr. Lacey obtained plaintiff's signature on a narcotic contract and prescribed MS Contin, as well as Vicodin (a brand name for the combination of the opioid hydrocodone and the analgesic acetaminophen).  Id.  On January 7, 2011, plaintiff told Dr. Lacey that the MS Contin helped for a couple of hours but then wore off, and that he did not think the Vicodin was effective for his breakthrough pain.  Ex. 7F/112 (AR 797).  Dr. Lacey increased the dosage of MS Contin and wrote another prescription for Vicodin, not to be filled before February 2, 2011.  Ex. 7F/113 (AR 798).  On January 28, 2011, plaintiff informed Dr. Lacey that the increased frequency of MS Contin had "helped a little bit," but that he had run out of Vicodin; Dr. Lacey surmised that plaintiff failed to understand the Vicodin was to be taken only as needed and the 60 pills he had been supplied needed to last for an entire month.  Ex. 7F/105 (AR 790).  Dr. Lacey issued new prescriptions, providing plaintiff two months worth of both MS Contin and Vicodin.  Ex. 7F/791 (AR 106).  Dr. Lacey also encouraged plaintiff to obtain a home cervical traction unit and declined to refer him back to physical therapy ("PT") in light of plaintiff's previous "no show" for PT.  Id.  On March 25, 2011, Dr. Lacey again increased plaintiff's dosage of MS Contin and provided him a three-month supply of both MS Contin and Vicodin.  Ex. 7F/95-96 (AR 780-81).  During the March 2011 visit, Dr. Lacey explained to plaintiff, in response to his inquiry about appealing the denial of his application for California workers' compensation benefits, that the medical evidence did not at that time establish he was permanently disabled from working.  Id.

1   treatment providers to recommend surgery rather than continuing with conservative care.[9]

2   *See* 1F/4 (AR 443).  On September 26, 2011, plaintiff underwent a C4 corpectomy,

3   anterior fusion of C3-C5, and anterior cervical diskectomy and fusion of C5-C6; the

4   surgery was performed by John N. Hsiang, M.D., Ph.D. at Swedish Hospital in Seattle.[10]

5   Ex. 4F/22-23 (AR 552-53).  On October 20, 2011, approximately three weeks after the

6   surgery, Dr. Hsiang issued a letter indicating that plaintiff reported significant post-

7   operative improvement in his symptoms; plaintiff was able to raise his right arm above

8   his head, although he fatigued quite quickly and was experiencing neck muscle spasms.

9   Ex. 3F/15 (AR 528).  Dr. Hsiang further stated that plaintiff "said he can return to work

10  full time next Monday."  *Id.*

11          On November 4, 2011, plaintiff continued to complain of significant neck pain and

12  weakness in his right upper extremity.  Ex. 7F/35 (AR 720).  Dr. Lacey assessed plaintiff

13

14  [9] While awaiting surgery, plaintiff visited Dr. Daniel on three occasions.  On July 8, 2011, plaintiff
complained of worsening depression, and Dr. Daniel instructed him to taper off Effexor XR over a two-
15  week period and begin taking Wellbutrin SR.  Ex. 7F/72 (AR 757).  On August 5, 2011, plaintiff
indicated that he had started a new job, that his pain was significantly worse, and that he had "burned
16  through" his pain medications.  Ex. 7F/70 (AR 755).  Dr. Daniel observed that plaintiff could hardly sit
still because of his discomfort.  *Id.*  Dr. Daniel prescribed MS Contin and oxycodone for the pain, as well
    as prednisone to help decrease inflammation.  *Id.*  On August 19, 2011, plaintiff informed Dr. Daniel that,
17  as a result of anxiety about the surgery, he had postponed it.  Ex. 7F/69 (AR 754).  Dr. Daniel observed
that plaintiff had improved strength in his right bicep, perhaps as a result of taking prednisone, and he
18  opined that delaying the surgery until late September was reasonable.  *Id.*  Dr. Daniel then doubled the
dosage of MS Contin from 30 mg to 60 mg every eight hours.  *Id.*

19  [10] A little over a week after the surgery, on October 7, 2011, plaintiff was seen in the emergency room at
Evergreen Hospital in Kirkland; he complained of neck pain and fever.  Ex. 2F/1-16 (AR 454-69).
20  Plaintiff was transported to Swedish Hospital, Ex. 2F/3 (AR 456), where he remained until October 11,
2011, Ex. 4F/47 (AR 577).  Plaintiff was diagnosed with seroma and compression of the thecal sac at C4
21  from postoperative fluid collection, was placed on Decadron (an anti-inflammatory), and was discharged
after his pain was under control.  *Id.*  Upon discharge, plaintiff received a supply of methylprednisolone
22  (an anti-inflammatory) and pregabalin aka Lyrica (an anticonvulsant used to treat nerve pain), and was
told to continue taking MS Contin and OxyContin, as well as bupropion aka Wellbutrin and a variety of
    other medications for diabetes and constipation.  Ex. 4F at 47-48 (AR 577-78).

23

1   as having improved since the surgery, but the range of motion in his neck was still

2   limited, and he continued to exhibit weakness in his right arm, with no reflexes at the

3   bicep.  Ex. 7F/36 (AR 721).  Dr. Lacey prescribed two months worth of oxycodone

4   (Roxicodone) and morphine (MS Contin), and directed plaintiff to follow up with him in

5   January 2012.  _Id._  On December 16, 2011, plaintiff returned, complaining of constant

6   numbness and pain following a mid-November drive to California and back, as well as

7   gastrointestinal upset, sweating, and shakiness.  Ex. 7F/32-33 (AR 717-18).  Plaintiff

8   indicated that, out of concern about an upcoming "house check" relating to a child

9   custody matter, he had disposed of all of his medications, and he believed he was

10   suffering from opiate withdrawal.  Ex. 7F/33 (AR 718).  Dr. Lacey did not observe signs

11   of withdrawal and ordered a urinalysis[11] to screen for pain medications; he also

12   prescribed oxycodone, with a taper plan to avoid withdrawal, and gabapentin (an

13   anticonvulsant used to treat nerve pain), which was to begin after plaintiff had been

14   weaned from the oxycodone.  Ex. 7F/35 (AR 720).  On December 22, 2011, plaintiff

15   complained to Dr. Daniel of nausea related to opiate withdrawal; Dr. Daniel advised

16   plaintiff to begin taking the gabapentin that evening and prescribed promethazine (aka

17   Phenergan) for the nausea.  Ex. 7F/31-32 (AR 716-17).

18         On December 27, 2011, plaintiff was brought by law enforcement personnel to the

19   emergency department at Swedish Hospital after having expressed a plan to take insulin

20

21   [11] The urinalysis results were positive for oxycodone and morphine, as well as for hydromorphone or
hydrocodone.  Ex. 7F/58 (AR 743).  Dr. Lacey, however, had not prescribed either of the latter two

22   medications.  _Id._  Dr. Lacey's notes reflect his intent to discuss this issue with plaintiff if plaintiff returns
to see him.  Ex. 7F/59 (AR 744).

23

to end his life.  Ex. 4F/75-81 (AR 605-11).  Plaintiff declined admission for inpatient care and was discharged approximately four hours later, after contracting for safety.  *Id.*  He saw Dr. Daniel the following day, December 28, 2011, and a referral was made to the psychiatry department at Pacific Medical Center.  Ex. 7F/30-31 (AR 715-16).  Another episode of suicidal ideation occurred on January 27, 2012, and plaintiff was transported by emergency medical service personnel to Swedish Hospital in Edmonds.  Ex. 5F/1-16 (AR 613-28).  Plaintiff indicated to Swedish Hospital staff that he had been weaned off narcotics at his own request and that he had been narcotic-free for four months.  Ex. 5F/8 (AR 620).  Urinalysis results were negative for opiates.  Ex. 5F/11 (AR 623).  Plaintiff further stated that he had been under a lot of stress, that he was not sleeping well, that his depression "came back in a sudden flood" after he ceased using narcotics, that the Wellbutrin he had been prescribed, *see supra* note 9, was not helping, and that he had made an appointment with a psychiatrist, which was still a month away.  Ex. 5F/8, 13 (AR 620, 625).  He was prescribed temazepam for his insomnia and hydrochlorothiazide, which is used to treat high blood pressure, and was discharged about three hours after he arrived.  Ex. 5F/7, 14-15 (AR 619, 626-27).

Shortly thereafter, Nha-Ke Ton, D.O. became plaintiff's primary care physician, seeing him multiple times between February 2012 and September 2013.  On February 16, 2012, Dr. Ton completed a DSHS form, indicating that plaintiff suffers from depression and anxiety, was unable to concentrate and interact with people, and was unable to work, look for work, or train to work for the next two months.  Ex. 6F/52-54 (AR 680-82).  During the same period in which plaintiff received medical services from Dr. Ton, he

1   also treated with Raman Arora, M.D., a psychiatrist.  Under Dr. Arora's care, plaintiff

2   titrated off bupropion XL (aka Wellbutrin) because of its side effects of agitation and

3   suicidal thoughts.  _See_ Ex. 7F/13 (AR 698).  Dr. Arora placed plaintiff on citalopram in

4   February 2012,[12] and then, in April 2012, tried augmenting the citalopram with lithium to

5   address plaintiff's symptoms of anxiety, irritability, and sleeplessness; in May 2012, he

6   switched to guanfacine (a medication often prescribed for attention deficit hyperactivity

7   disorder ("ADHD")), when the lithium proved ineffective.  Ex. 7F/10-15 (AR 695-700).

8   On May 9, 2012, after three sessions with plaintiff, Dr. Arora signed a letter diagnosing

9   plaintiff with recurrent major depression that is resistant to treatment, anxiety disorder,

10   and attention or concentration deficit.[13]  Ex. 6F/57 (AF 685).  On the same day, Dr. Arora

11   assigned plaintiff a Global Assessment of Functioning ("GAF") score of 55.[14]  Ex. 7F/12

12   (AR 697).

13

_____

14   [12] The treatment notes relating to plaintiff's February 28, 2012, appointment with Dr. Arora are missing
15   from the Administrative Record; however, Dr. Arora's entries concerning subsequent visits discuss the
    steps taken during his initial consultation with plaintiff in February 2012.

16   [13] On September 7, 2012, plaintiff disclosed to Dr. Ton a history of multiple head injuries during his
    adolescence, including a fall from the second floor of a school onto concrete, a motorcycle accident, a
17   loss of consciousness after being hit with a soccer ball, and a rollover car accident.  Ex. 10F/12 (AR 870).
    Dr. Ton referred plaintiff to Anne Mai, M.D., a neurologist, for evaluation in light of this history and
    plaintiff's concerns about concentration and attention deficit.  _See_ Ex. 10F/8 & 15 (AR 866 & 873).
18   Neuropsychological testing did not support a diagnosis of ADHD.  Ex. 10F/8 (AR 866).  Rather,
    plaintiff's attention and concentration were thought to be "impacted and limited by his social anxiety,
19   generalized anxiety, and depression," which were "poorly controlled."  _Id._; _see also_ Ex. 24F/4 (AR 1009).

20   [14] Global Assessment of Functioning, which had been Axis V in a multi-axial system for assessing mental
    disorders, is no longer in widespread use.  _See_ AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL
21   MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013) ["DSM-5"].  The GAF scale had ranged from 0 to
    100, with each 10-point increment having both a symptom severity and a functioning component; a
    GAF rating would fall within a particular decile (_e.g._, 1-10, 11-20, etc.) if either the symptom severity or
22   the level of functioning met the criteria.  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL
    MANUAL OF MENTAL DISORDERS 32 (4th ed. (Text Revision) 2000); _see id._ at 33 (indicating that, when

23

On June 19, 2012, Dr. Arora again changed plaintiff's depression medication, tapering the citalopram and starting him on fluoxetine (aka Prozac), augmented with both Vistaril (a brand of hydroxyzine) and guanfacine for anxiety and sleeplessness. Ex. 7F/6 (AR 691). On September 5, 2012, Abilify (a brand of aripiprazole, an antipsychotic) was added to the mix. Ex. 10F/17 (AR 875). On October 10, 2012, plaintiff reported improvement with Abilify; he was still restless and experiencing insomnia, but his mood was uplifted and he no longer felt sad. Ex. 10F/10 (AR 868). Dr. Arora observed mildly rapid speech, but linear and goal-directed thought processes, as well as fair insight and judgment. Ex. 10F/11 (AR 869). Plaintiff denied having any thoughts of suicide since discontinuing his use of Wellbutrin. *Id.*

After about a six-month hiatus, on July 3, 2013, plaintiff advised Dr. Arora that he was still depressed, and was experiencing perseveration and anxiety each morning, with the feeling of knots in his stomach, the urge to vomit, and hyperventilation. Ex. 18F/22 (AR 981). Dr. Arora prescribed lorazepam (aka Ativan) for the morning anxiety, and directed plaintiff to continue taking citalopram and guanfacine; he noted that plaintiff had not tolerated Vistaril (hydroxyzine). Ex. 18F/22-23 (AR 981-82). On August 16, 2013, plaintiff told Dr. Arora that he was experiencing a "poop out" effect with the citalopram, as he had with other medications, and Dr. Arora transitioned him to Cymbalta (a brand

an "individual's symptom severity and level of functioning [were] discordant, the final GAF rating always reflect[ed] the worse of the two"). The GAF methodology was considered "useful in tracking the clinical progress of individuals in global terms, using a single measure" with respect to "psychological, social, and occupational functioning," but not as to physical impairments or environmental limitations. *Id.* at 32. The DSM-5 has moved away from the axial diagnosis method and discarded the GAF scale because of "its conceptual lack of clarity" and "questionable psychometrics in routine practice." DSM-5 at 16.

name for duloxetine, a serotonin-norepinephrine reuptake inhibitor).  Ex. 24F/48-49 (AR 1053-54).  On September 27, 2013, the last visit for which notes are contained in the Administrative Record, plaintiff indicated that he had been delayed in starting Cymbalta by insurance issues, but had been taking it for two weeks.  Ex. 24F/3 (AR 1008).  He was still experiencing anxiety in the morning, requiring him to rock back and forth for a lengthy period to calm down; this process generally lasted half the morning.  *Id.*  Dr. Arora agreed to substitute diazepam (aka Valium) for lorazepam and warned plaintiff against driving or drinking while the medication was in his system.  Ex. 24F/3-4 (AR 1008-09).

In September 2013, Dr. Ton signed a letter indicating that plaintiff "has multiple conditions that interfere with his ability to work or do work training, including chronic low back pain, chronic neck pain, depression, anxiety, attention deficit disorder, neuropathy of the right lower extremity, and also bilateral diabetic neuropathy and neuropathic pain."  Ex. 20F/1 (AR 1001).  Dr. Ton wrote that plaintiff is unable to leave the house, on average about two or three times per week, and that plaintiff cannot concentrate for more than five minutes, sit for more than 20 minutes, or lift more than five pounds.  *Id.*  He opined that plaintiff cannot do even sedentary work.  *Id.*

Around the same time in September 2013, Dr. Arora also issued a letter on plaintiff's behalf.  Dr. Arora stated that plaintiff's attention deficit prevents him from concentrating on any single task and that medication and therapy have not remedied his condition.  Ex. 22F/1 (AR 1004).  Dr. Arora further explained that plaintiff suffers from severe anxiety and social anxiety, and has been on numerous medications without viable

results. _Id._ According to Dr. Arora, plaintiff's conditions "severely impair his ability to function and participate in the regular workforce." _Id._

During this same timeframe, plaintiff was being treated by Xing Fu, M.D., a member of Pacific Medical Center's Interventional Pain Management department.[15]  On August 28, 2013, Dr. Fu administered a total of eight trigger point injections into three different muscles of plaintiff's upper back, five on the left side and three on the right. Ex. 24F/40 (AR 1045).  On September 12, 2013, plaintiff again visited Dr. Fu, reporting that the injections had provided relief for only a week and a half.  Ex. 24F/25 (AR 1030). Dr. Fu declined to repeat the injections in light of their limited success and the risks of steroid exposure. _Id._  On September 25, 2013, plaintiff returned to Dr. Ton, complaining of neck and low back pain, as well as migraine headaches.[16]  Ex. 24F/8 (AR 1013). Dr. Ton prescribed acetaminophen with codeine (a narcotic), as well as methocarbamol. Ex. 24F/12 (AR 1017).

---

[15] Plaintiff's first appointment with Dr. Fu was preceded by a visit on July 23, 2013, with Dr. Lacey, during which plaintiff complained of pain in his neck, shoulder, and right upper extremity, as well as headaches.  Ex. 18F/1 (AR 960).  Dr. Lacey noted that Dr. Ton had seen plaintiff in May and July 2013, had prescribed methocarbamol (a muscle relaxant), and had referred plaintiff to PT and massage therapy. _Id._  Dr. Lacey told plaintiff that returning to opiates was not a good idea, and advised him to use naproxen and Tylenol, to focus on ergonomics and exercise, to get into PT as directed by Dr. Ton, and to consider trigger point injections if PT did not help.  Ex. 18F/3 (AR 962).

[16] On December 23, 2013, Jerry Mikszewski, M.D., a neurologist at Pacific Medical Center in Beacon Hill, authored a letter stating that he was treating plaintiff for headaches, that plaintiff was discovered to have suffered strokes in his right cerebellum, likely as a result of his diabetes and hyperlipidemia, and that further studies were ongoing.  Ex. 25F/1 (AR 1079).  In ALJ Morris's decision, no mention was made of Dr. Mikszewski's letter, which was written after the hearing, but before ALJ Morris ruled, and before the expiration of plaintiff's period of insured status on December 31, 2015, _see_ AR 14.  Plaintiff has not, however, assigned error to any failure to consider Dr. Mikszewski's diagnosis of diabetes-triggered strokes.  In addition, plaintiff has not explained why medical records supporting such diagnosis were not previously incorporated into the Administrative Record, and he has not indicated when such strokes began occurring, whether they were a cause of any of his previously manifested symptoms, or whether they substantially affect his residual functional capacity.

B.     **Physical Residual Functional Capacity**

In denying plaintiff's DIB and SSI applications, ALJ Morris gave "significant weight" to the opinions of Gordon Hale, M.D. and Howard Platter, M.D., non-examining medical consultants for the Division of Disability Determination Services ("DDS"), a state agency that, pursuant to federal regulations, makes initial assessments concerning eligibility for DIB and SSI benefits and processes reconsideration requests.[17]  AR 22; _see_ Exs. 2A/8-11 & 4A/8-11 (AR 107-10 & 124-27) (Hale, Sep. 21, 2012); Exs. 6A/8-11 & 8A/8-11 (AR 141-44 & 159-62) (Platter, Feb. 13, 2013).  According to Drs. Hale and Platter, at the time of their review, plaintiff could occasionally (⅓ or less of an eight-hour workday) and frequently (⅓ to ⅔ of an eight-hour workday) lift or carry ten pounds, could sit, stand, or walk for six hours in an eight-hour workday (with normal breaks), and could frequently climb stairs, stoop, kneel, and crouch, but could not climb ladders, ropes, or scaffolds, could not crawl, was limited in his ability to reach overhead, needed

---

[17] Plaintiff has assigned error to ALJ Morris's refusal to subpoena Drs. Hale and Platter.  When "reasonably necessary for the full presentation of a case," an ALJ may either sua sponte or at the request of a party issue subpoenas for the appearance and testimony of witnesses and/or the production of documents.  20 C.F.R. §§ 404.950(d)(1) & 416.1450(d)(1).  An ALJ has discretion to decide when a subpoena and related cross-examination is warranted.  _Solis v. Schweiker_, 719 F.2d 301, 302 (9th Cir. 1983); _see Tarter v. Astrue_, 2012 WL 1631968 at *3 (W.D. Wash. Apr. 17, 2012) (report and recommendation to reverse and remand), _adopted_ 2012 WL 1631887 (W.D. Wash. May 9, 2012).  An ALJ abuses such discretion, and violates the claimant's procedural due process rights, if he or she does not subpoena or permit cross-examination of an examining physician who is a "crucial witness" and "whose findings substantially contradict the other medical testimony."  _Solis_, 719 F.2d at 301.  Neither Dr. Hale nor Dr. Platter was a "crucial witness."  They did not treat or examine plaintiff.  They merely reviewed the medical evidence in the record and formulated opinions that ALJ Morris was required to consider, but was not bound to accept.  _See Yost_, 2016 WL 2989957 at *6-*7.  Moreover, the opinion most at odds with those of Drs. Hale and Platter, namely Dr. Ton's September 2013 assessment, was not part of the record when they reached their conclusions, and no purpose would have been served by cross-examining them about medical records they had never seen.  ALJ Morris did not err in denying plaintiff's request to subpoena Drs. Hale and Platter.

to avoid concentrated exposure to hazards like machinery and heights, and needed to

avoid even moderate exposure to vibration.  Ex. 2A/9-10 (AR 108-09); Ex. 4A/9-10

(AR 125-26); Ex. 6A/9-10 (AR 142-43); Ex. 8A/9-10 (AR 160-61).  ALJ Morris adopted

the assessments of Drs. Hale and Platter concerning plaintiff's physical residual

functional capacity, with one modification – he added that plaintiff "requires the

flexibility to periodically alternate between sitting and standing, but this can be

accomplished with normal breaks and lunch and those work tasks that require such

changes."  AR 19, 22.

### C.    Mental Residual Functional Capacity

ALJ Morris also gave "some weight" to the opinions of Diane Fligstein, Ph.D. and

Jan L. Lewis, Ph.D., non-examining psychologists for DDS.  AR 22.  Drs. Fligstein and

Lewis indicated that plaintiff does not have any understanding or memory limitations, but

does have sustained concentration and persistence limitations, as well as social

interaction limitations.  Exs. 2A/11-12 & 4A/11-12  (AR 110-11 & 127-28) (Fligstein,

Oct. 16, 2012); Exs. 6A/11-12 & 8A/11-12 (AR 144-45 & 162-63) (Lewis, Feb. 9, 2013).

According to Drs. Fligstein and Lewis, plaintiff is able to carry out detailed tasks on a

regular basis, but would have some trouble with regular attendance and interruptions

from psychologically-based symptoms as a result of his persistent conditions; however,

they believed that these problems could be mitigated with more independent and isolated

work environments.  Ex. 2A/12 (AR 111); Ex. 4A/12 (AR 128); Ex. 6A/12 (AR 145);

Ex. 8A/12 (AR 163).  Drs. Fligstein and Lewis also found plaintiff to be markedly limited

in his ability to interact appropriately with the general public and moderately limited in

his abilities to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  _Id._  They explained that plaintiff "has trouble leaving his house and displays signs of anxiety that would not make him a good candidate for regular public contact," and he is "quite reactive to stress, and would need to work in a non-stressful environment."  _Id._

ALJ Morris framed plaintiff's mental residual functional capacity as follows:

> He is able to carry out detailed tasks for about two hours duration, after which he is limited to performing simple routine tasks for at least two hours before he can return to performing detailed tasks; he can alternate between detailed and simple work in this fashion throughout an eight-hour workday. He can have occasional contact with coworkers for work tasks averaging 20 minutes or less an occurrence, but there should be an emphasis on occupations/duties dealing with things/objects rather than people.  There should be no contact with the public for work tasks, but incidental contact with the public is not precluded.

AR 19.  ALJ Morris agreed with Drs. Fligstein and Lewis that plaintiff would do best in more independent work environments, AR 22, but did not include such limitation in his description of plaintiff's mental residual functional capacity.  Moreover, although ALJ Morris did not explicitly discount Drs. Fligstein's and Lewis's opinions concerning plaintiff's need to work in a non-stressful environment, he did not incorporate such restriction in his assessment of plaintiff's mental residual functional capacity, and he cited no evidentiary basis for ignoring such restriction.  Likewise, ALJ Morris did not include either the "independent work" or "non-stressful" environment restrictions in any of the four scenarios about which he questioned the vocational expert, Paul Prachyl.  _See_ AR 89-94.

ORDER - 16

**D.** __Decision on Appeal__

Based on his conclusions concerning plaintiff's residual functional capacity and the testimony of the vocational expert,[18] ALJ Morris determined that plaintiff could make an adjustment to work as either an electrical accessories assembler or a document preparer.  AR 25-26.  According to the vocational expert, both jobs exist in significant numbers in the national and local economies.  AR 91-92.  ALJ Morris therefore found that plaintiff is not "disabled" within the meaning of the Social Security Act.  AR 26.  On July 7, 2015, the Appeals Council denied plaintiff's request for review.  AR 1-3.  This matter seeking judicial review was timely commenced.  _See_ Compl. (docket no. 1); _see also_ 42 U.S.C. § 405(g).  On appeal, plaintiff raises the following issues:  (i) whether

---

[18] The vocational expert was asked to assume that an individual is the same age as plaintiff and had similar educational and prior work experiences.  AR at 89.  For the first hypothetical, the individual was presumed to have a residual functional capacity equivalent to what ALJ Morris had assessed for plaintiff, namely a physical ability to frequently lift or carry ten pounds, to sit, stand, or walk with normal breaks for six of eight hours in a workday, to frequently climb ramps and stairs, balance, stoop, kneel, and crouch, and to occasionally reach overhead bilaterally, but not to climb ladders, ropes, or scaffolds or to crawl, withstand concentrated exposure to hazards like dangerous machinery or unprotected heights, or withstand even moderate exposure to vibration, as well as a mental ability to carry out detailed tasks for two hours, to perform simple, routine tasks with customary breaks, and to have occasional contact with co-workers for work tasks averaging 20 minutes or less each, but a need to deal primarily with things and objects, rather than people, and to avoid contact with the public for work tasks.  AR 90.  The vocational expert testified that an individual with this residual functional capacity could not perform plaintiff's past jobs, but could work as an electrical accessories assembler, an inspector and hand packager, or a poultry dresser.  AR 90-92.  In the second scenario, ALJ Morris added a restriction that the individual must periodically alternate between sitting and standing, accomplished with normal breaks, lunch, and work tasks requiring such changes.  AR 92.  The vocational expert indicated that the sit/stand limitation would preclude the inspector and hand packager, as well as the poultry dresser, position, but that the occupation of document preparer would satisfy the sit/stand and other parameters.  _Id._  With respect to the third hypothetical, which involved the same residual functional capacity as the second scenario, except that the exertional level was defined as sedentary, rather than light work, the vocational expert indicated that the occupational base was completely eroded, explaining that sedentary assembly jobs do not typically have an option to stand up and work.  AR 93.  The fourth situation about which ALJ Morris questioned the vocational expert did not concern a specific residual functional capacity, but rather the effect, if any, of two unexcused absences per month.  AR 94.  The vocational expert testified that two unexcused absences per month was "well over the accepted tolerance that employers have in any job."  _Id._

1  ALJ Morris properly assessed plaintiff's residual functional capacity and posed apt

2  hypotheticals to the vocational expert; (ii) whether ALJ Morris appropriately discounted

3  the opinions of plaintiff's treatment providers; and (iii) whether ALJ Morris adequately

4  explained his evaluation of plaintiff's credibility.

5  **<u>Discussion</u>**

6        This Court's review is limited to assessing whether the ultimate denial of benefits

7  is free of legal error and based on factual findings that are supported by substantial

8  evidence.  <u>See</u> <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998); <u>see also</u> 42 U.S.C.

9  § 405(g).  Substantial evidence means "more than a mere scintilla, but less than a

10 preponderance" of evidence; it is "such relevant evidence as a reasonable person might

11 accept as adequate to support a conclusion." <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035

12 (9th Cir. 2007).  In determining whether the factual findings are supported by substantial

13 evidence, the Court must "review the administrative record as a whole, weighing both

14 the evidence that supports and the evidence that detracts from the Commissioner's

15 conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998).  The Court "may not

16 affirm simply by isolating a specific quantum of supporting evidence." <u>Jones v. Heckler</u>,

17 760 F.2d 993, 995 (9th Cir. 1985).  If, however, the evidence reasonably supports both

18 affirming and reversing the denial of benefits, the Court may not substitute its judgment

19 for that of the ALJ.  <u>See</u> <u>Reddick</u>, 157 F.3d at 720-21; <u>see also</u> <u>Thomas v. Barnhart</u>, 278

20 F.3d 947, 954 (9th Cir. 2002) (if "the evidence is susceptible to more than one rational

21 interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

22 upheld").

23

A.    **Plaintiff's Residual Functional Capacity**

In assessing whether plaintiff is "disabled" within the meaning of the Social

Security Act, ALJ Morris was required to employ a five-step sequential evaluation

process.[19]  The first four stages of ALJ Morris's analysis are not at issue in this litigation.

With respect to step five, however, plaintiff argues that ALJ Morris reached an incorrect

decision because his assessment of plaintiff's residual functional capacity ("RFC") did

not reflect all of plaintiff's limitations, particularly the "non-stressful environment"

restriction that was identified by Drs. Fligstein and Lewis and not explicitly discounted

by ALJ Morris.  The Commissioner has not addressed this issue in her response brief.

The Court agrees with plaintiff that ALJ Morris erred by failing to either

(i) include in the RFC the low-stress restriction outlined by Drs. Fligstein and Lewis, or

---

[19] Step one of the sequential evaluation process inquires whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i); _see also_ _id._ at § 404.1572 (defining "substantial gainful activity").  If so, the claimant is not entitled to disability benefits, and no further evaluative steps are required. _Id._ at §§ 404.1520(b) & 416.920(b).  Step two asks whether the claimant has a severe impairment, or a combination of impairments, that significantly limits the claimant's physical or mental ability to do basic work activities. _See_ _id._ at §§ 404.1520(a)(4)(ii)&(c) and 416.920(a)(4)(ii)&(c).  If not, the claimant is not entitled to disability benefits, and again, additional analysis is not required. _Id._  Step three involves a determination of whether any of the claimant's severe impairments is equivalent to one that is listed in the regulations. _Id._ at §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii).  A claimant with an impairment that "meets or equals" a listed impairment for the requisite twelve-month duration is "per se" disabled and qualifies for benefits. _See_ _id._ at §§ 404.1520(d) & 416.920(d).  If the claimant is not "per se" disabled, then the question under step four is whether the claimant's "residual functional capacity" enables the claimant to perform past relevant work. _Id._ at §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv).  If the claimant can still perform past relevant work, then the claimant is not entitled to disability benefits and the inquiry ends there. _Id._ at §§ 404.1520(e)-(f) & 416.920(e)-(f).  On the other hand, if the opposite conclusion is reached, the burden shifts to the Commissioner at step five to prove that the claimant can make an adjustment to other work, taking into account the claimant's age, education, and work experience. _Id._ at §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v); _see_ _id._ at §§ 404.1560(c)(2) & 416.960(c)(2).  If the claimant cannot make such adjustment to other work, disability benefits may be awarded. _Id._ at §§ 404.1520(g) & 416.920(g).

(ii) provide a basis for rejecting such limitation.  As indicated in a long-standing Social

Security Ruling:

> The reaction to the demands of work (stress) is highly individualized, and
> mental illness is characterized by adverse responses to seemingly trivial
> circumstances.  The mentally impaired may cease to function effectively
> when facing such demands as getting to work regularly, having their
> performance supervised, and remaining in the workplace for a full day. . . .
> Any impairment-related limitations created by an individual's response to
> demands of work . . . must be reflected in the RFC assessment.

SSR 85-15 at § 1 (1985).[20]  ALJ Morris's complete silence on the issue of stress

"undermines the integrity of his RFC analysis."  *See* *Cottam v. Colvin*, 51 F. Supp. 3d

1038, 1049 (E.D. Wash. 2014); *see also* *Sampson v. Colvin*, 2015 WL 5024076 at *3

(W.D. Wash. Aug. 25, 2015); *cf.* *Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir.

2015) (holding that totally ignoring a physician and his or her opinion constitutes error).

The Court further concludes that ALJ Morris's error is not harmless.  *See* *Marsh*,

792 F.3d at 1173 (harmless error analysis applies when, in the social security context, a

particular medical opinion is not mentioned in the decision denying benefits).  Errors in

social security rulings are harmless "if they are 'inconsequential to the ultimate non-

disability determination.'"  *Id.* (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d

1050, 1055 (9th Cir. 2006)).  A reviewing court cannot, however, consider harmless an

error in failing to discuss specific evidence "unless it can confidently conclude that

---

[20] "Social Security Rulings constitute the Social Security Administration's interpretations of the statute it administers and of its own regulations."  *Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1135 n.8 (C.D. Cal. 2009) (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)).  Although they do not have "the force of law," after Social Security Rulings are published, they are binding on ALJs and the Commissioner.  *Id.* (citing *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999); *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996)).

1   no reasonable ALJ, when fully crediting the testimony, could have reached a different

2   disability determination."  <u>Stout</u>, 454 F.3d at 1056.

3          Because the low-stress restriction described by Drs. Fligstein and Lewis was

4   omitted from the RFC, without explanation,[21] and the vocational expert was not asked

5   how such limitation might affect plaintiff's ability to adjust to other work, the Court

6   cannot determine whether the hypothetical "reasonable ALJ" would have reached the

7   same result as ALJ Morris.  Whether the jobs previously identified by the vocational

8   expert, or other positions available in significant numbers in the national and local

9   economy, entail the type of "non-stressful environment" that Drs. Fligstein and Lewis

10  have indicated plaintiff needs is a question best addressed in the first instance by

11  ALJ Morris and the Commissioner, and thus, this matter will be reversed and remanded

12  for further administrative proceedings.  <u>See</u> <u>Sampson</u>, 2015 WL 5024076 at *4.

13         **B.**     <u>**Opinions of Plaintiff's Treatment Providers**</u>

14         Plaintiff also contends that ALJ Morris improperly ascribed "little weight" to

15  (i) Dr. Widemark's June 2010 assessment; (ii) Dr. Over's September 2013 letter; (iii) the

16  DSHS forms completed by Dr. Daniel in August 2010 and March 2011; (iv) a DSHS

17  form completed by Dr. Ton in February 2012, as well as Dr. Ton's September 2013

18  letter; and (v) Dr. Arora's May 2012 GAF score and September 2013 assessment.  <u>See</u>

19

20  ────────────────────

21  [21] The Court makes no ruling concerning whether Drs. Fligstein's and Lewis's opinions about plaintiff's inability to tolerate stress could be discounted in light of other evidence in the Administrative Record. The Court observes, however, that plaintiff's self-reports about needing to rock himself back and forth for

22  half the morning each day to calm down and Dr. Arora's related decision to prescribe diazepam (aka Valium) for him are consistent with Drs. Fligstein's and Lewis's assessments.

23

ORDER - 21

AR 22-23.[22]  With regard to Dr. Widemark's and Dr. Over's opinions, plaintiff has

offered no analysis to support his assertion that ALJ Morris somehow erred, _see_ _supra_

notes 5 & 7, and the Court is satisfied that ALJ Morris provided both "clear and

convincing" and "specific and legitimate" reasons[23] for ignoring Dr. Widemark's and

Dr. Over's views.  _See_ AR 22-23.

Both DSHS forms completed by Dr. Daniel predated plaintiff's September 2011

surgery, and their accuracy is undermined by more recent functional assessments, as well

as by plaintiff's October 2011 statement to Dr. Hsiang that he could return to work full

time.  Thus, ALJ Morris properly discounted the DSHS forms signed by Dr. Daniel.  In

addition, ALJ Morris appropriately found little evidentiary value in the DSHS form filled

out by Dr. Ton in February 2012, which was by its own terms limited to a two-month

period; on the DSHS form, Dr. Ton essentially indicated that plaintiff had been referred

to psychiatry to address depression, anxiety, concentration, and social interaction issues,

and he offered no evaluation of plaintiff's long-term mental status.  ALJ Morris also had

legally sufficient grounds for not accepting Dr. Ton's opinion, set forth in his September

2013 letter, that plaintiff cannot sit for more than 20 minutes, lift more than five pounds,

---

[22] ALJ Morris also disregarded a hand-written note by Joseph Earl, a certified physician assistant, dated January 22, 2010, Ex. 16F/1 (AR 920), and a letter from Golbanoo Ghavami, a rehabilitation nurse at Kindred Hospital and Madison Assisted Living, dated September 22, 2013, Ex. 21F/1-2 (AR 1002-03). _See_ AR 22-23.  Plaintiff has not assigned error to these portions of ALJ Morris's decision.

[23] In the social security context, the opinion of a treating physician is generally entitled to more weight than the opinions of examining or non-examining (consulting) physicians.  _Lester v. Chater_, 81 F.3d 821, 830 (9th Cir. 1995).  When a doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  _Id._  On the other hand, in the event of disagreement among physicians, a treating or examining doctor's opinion can be disregarded only for "specific and legitimate" reasons supported by "substantial evidence" in the record.  _Id._

ORDER - 22

1   or do even sedentary work.[24]  The medical evidence does not support these limitations,

2   and they are contradicted by Dr. Ton's own assessment, reflected in the DSHS form he

3   had earlier completed, indicating that plaintiff had no limitations with respect to lifting

4   and carrying, sitting, standing, or walking.  *See* Ex. 6F/53 (AR 681).  Likewise, ALJ

5   Morris did not err in disregarding the GAF score estimated by Dr. Arora, particularly in

6   light of the DSM-5's subsequent departure from GAF methodology.  *See* *supra* note 14.

7          With respect, however, to Dr. Arora's September 2013 discussions about

8   plaintiff's psychological impairments, ALJ Morris did not provide the requisite "clear

9   and convincing" reasons for disregarding them.  In discussing Dr. Arora's opinions,

10   ALJ Morris never addressed the problem identified in Dr. Arora's September 2013 letter,

11   which was also apparent from his treatment notes, namely that plaintiff's depression

12   seems to be resistant to treatment and that numerous medications have been tried without

13   long-term success.  In her response brief, the Commissioner suggests that plaintiff's

14   failure to engage in psychotherapy, about which Dr. Arora challenged him in May 2012,

15   Ex. 7F/10 (AR 695), undermines any conclusion that plaintiff's depression is treatment

16   resistant.  Although the Commissioner's reason for doubting the diagnosis might be valid,

17   ALJ Morris made no such finding.  Moreover, according to Dr. Arora's notes from an

18

---

19   [24] In his September 2013 correspondence, Dr. Ton also described plaintiff's difficulty leaving the house.
     Ex. 20F/1 (AR 1001).  Although this statement appears to be based entirely on plaintiff's own reports, it
20   is consonant with Drs. Fligstein's and Lewis's opinions, with which ALJ Morris explicitly agreed, *see*
     AR 22, that plaintiff might have trouble with regular attendance at work and would benefit from a more
21   independent and isolated work environment.  Because ALJ Morris did not incorporate the "independent
     and isolated work environment" restriction into the RFC or explain why he did not do so, the Court
22   declines to rule on whether Dr. Ton's related "difficulty leaving the house" assessment could properly be
     ignored.

23

October 2012 visit, plaintiff was then regularly seeing a psychotherapist.  Ex. 10F/10-11

(AR 868-69).  In September 2013, Dr. Arora told plaintiff that he needed to "intensify his

treatment" and recommended that he get evaluated at Compass Health or another

community mental health clinic and engage in weekly individual therapy, group therapy,

and vocational rehabilitation, Ex. 24F/4 (AR 1009), but whether these steps would have

been in addition to existing psychotherapy, or whether plaintiff had ceased going to

psychotherapy and, if so, when, cannot be determined from the Administrative Record.

The Court is persuaded that failing to separately discuss Dr. Arora's diagnosis that

plaintiff's depression is treatment resistant constitutes error that cannot be considered

harmless.

### C.     Plaintiff's Credibility

ALJ Morris's decision contains the following passage:

> After careful consideration of the evidence, I find that the claimant's
> medically determinable impairments could reasonably be expected to cause
> some of the alleged symptoms.  However, her [sic] statements concerning
> the intensity, persistence, and limiting effects of these symptoms are not
> entirely credible for the following reasons.

AR 20.  Plaintiff argues that ALJ Morris failed to explain which of plaintiff's alleged

symptoms or limitations were considered "not entirely credible," making review of

ALJ Morris's credibility determination impossible.  The Court disagrees.  In the absence

of affirmative evidence showing that a claimant is malingering,[25] an ALJ's reasons for

---

[25] ALJ Morris did not find that plaintiff was malingering and, despite evidence of narcotic addiction, he
did not articulate a suspicion that plaintiff was currently or had previously been engaged in drug-seeking
behavior.

ORDER - 24

rejecting the claimant's testimony must be "clear and convincing." _Lester_, 81 F.3d at 834.  The Ninth Circuit has made clear that general findings concerning a claimant's credibility are insufficient; rather, an ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." _Id._

ALJ Morris satisfied all of these requirements.  He indicated what testimony he was discounting, namely plaintiff's complaints about the "intensity, persistence, and limiting effects" of his symptoms,[26] and he listed three grounds for doubting plaintiff's credibility:  (i) independent daily activities and social interactions that were inconsistent with plaintiff's allegations of disabling functional limitations, in particular, chopping wood in November 2010, playing on an Xbox over the holidays in 2010, spending hours on the computer doing challenging graduate course work between November 2010 and January 2011, driving to and from California in November 2011, caring for his young children, and performing light household chores, including cooking and shopping for

---

[26] Plaintiff alleges a variety of impairments, from weakness in his right arm and an inability to lift even a jug of milk, AR 77, to an inability to drive when on prescribed pain medication (Tylenol with codeine) because of nausea and dizziness, AR 69, to problems with mobility and sitting for long periods as a result of a fall down a flight of stairs about a year after his September 2011 surgery, AR 77-78, to symptoms of anxiety and depression that, about two or three times a week, render him powerless to do anything, and that make him seclude himself from his family, AR 78-79, 83-84.  The Administrative Record, however, does not support plaintiff's assertion that such symptoms began in February 2007 or in January 2010, the alleged disability onset dates.  In November 2009, Dr. Nishime indicated that plaintiff could perform the equivalent of light work (lifting or carrying ten pounds), _see_ _supra_ note 4, and in March 2011, Dr. Lacey told plaintiff that the medical evidence did not, at that time, establish he was permanently disabled from working, _see_ _supra_ note 8.  The right-arm weakness was first observed in April 2011, was surgically addressed less than six months later, and according to Dr. Ton, was no longer a disabling condition by February 2012.  Moreover, in October 2011, plaintiff told his surgeon, Dr. Hsiang, that he could return to work full time.  The anxiety and depression did not prevent plaintiff from pursuing graduate studies through the early part of 2011 or give rise to suicidal ideation until the end of 2011.  In early 2012, plaintiff ceased taking Wellbutrin and has not had any thoughts of suicide since then.  The fall down the stairs did not occur until the autumn of 2012, and the Tylenol with codeine does not appear to have been prescribed until September 2013.

ORDER - 25

groceries; (ii) medical evidence that did not substantiate a continuous or 12-month period of disabling functional limitations; and (iii) plaintiff's collection of unemployment benefits between the second quarter of 2011 and the first quarter of 2012, indicating that plaintiff was "ready, willing, and able to work" during such period.  _See_ AR 17-18 & 20-22.  The Court is satisfied that these reasons are sufficiently "clear and convincing" and supported by the record.

**<u>Conclusion</u>**

For the foregoing reasons, the denial of plaintiff's DIB and SSI applications is REVERSED and this matter is REMANDED for further administrative proceedings. Plaintiff's request for an order that the case be reassigned on remand to a different administrative law judge is DENIED.  The Clerk is DIRECTED to enter judgment consistent with this Order, to send a copy of this Order to all counsel of record, and to CLOSE this case.

IT IS SO ORDERED.

Dated this 1st day of September, 2016.

Thomas S. Zilly
United States District Judge

ORDER - 26